With all due respect, Mr. Martin, something happens between year 33 and 36, apparently. I feel like I've been at this a long time. My name is Bruce Billman. I represent Lisa Dunn in this matter. I want to sincerely thank the Court for offering us the opportunity to offer further comments about the very important issues in this case. As time allows today, I'll be addressing the significance of this Court's published opinion last week in Mascio v. Colvin on the way to the professional opinions and the credibility issues raised in the briefs. Before beginning with the arguments in chief, however, I feel like I need to take something off the table. In her brief, the Commissioner offers at least three different arguments for affirming the ALJ's decision. Those arguments were never a basis for the denial of the claim by the ALJ. Thus, any of the following arguments proffered in the Commissioner's brief or in her argument today should be rejected out of hand under the well-known Chenery Doctrine. First, the Commissioner has argued that Ms. Dunn's credibility should have been discounted, quote-unquote, because the objective medical evidence contradicted Dunn's extreme allegations. This reason never appears in the ALJ's decision. Secondly, Ms. Dunn's credibility should be discounted because of the supposed, quote-unquote, contradictory statements. This reason also never appears in the ALJ's decision. And then finally, there's a significant portion of the Commissioner's argument that contends that Ms. Dunn's psychiatric condition had improved. The ALJ did make reference to improvement in his decision, but the improvement was only with respect to Ms. Dunn's physical problems. He never mentioned, said, or found that Ms. Dunn's psychiatric problems had improved at all. The only sentence contained in the ALJ's decision about improvement is that Ms. Dunn's migraine headaches and rheumatoid arthritis have been responsive to treatment, including medications and trigger-point injections. Ms. Dunn has never contended that this case was about her physical problems at all. This case has always been about her psychiatric problems. But the point is that Ms. Dunn's supposed psychiatric improvement was never a basis of the ALJ's decision, and any argument to the contrary should be rejected. I'd like to turn to the effect of this Court's decision last week in Mossio v. Colvin. It's a published opinion, and a great deal of the rationale in Mossio applies with sizable force to the facts and findings in Ms. Dunn's case. First, the Mossio Court noted that the central core concept of disability has to do with one's ability to work consistently. Quoting Mossio at page 11 of the opinion, although the ALJ concluded that Mossio can perform certain functions, he said nothing about Mossio's ability to perform them for a full workday. The missing analysis is especially troubling because the record contains conflicting evidence as to Mossio's residual functional capacity. The difference between Mossio and Ms. Dunn's case is that the evidence in Ms. Dunn's case, the evidence, has no conflict whatsoever as to Ms. Dunn's residual functional capacity. Each and every one of the health care professionals agree that Ms. Dunn has a marked impairment in her ability to concentrate, persist, and maintain pace on a job. This led to the uncontradicted testimony of the vocational expert that ruled out all work. That's at page 98 of the record. There are four health care professionals here. Two are Ms. Dunn's health care professionals, her treating psychiatrist, Dr. Swing, who opined that Ms. Dunn had a marked impairment in her ability to concentrate, persist, and maintain pace. Ms. Dunn's counselor, Ms. Gosnell, also opined that she had a marked impairment in the ability to concentrate, persist, and maintain pace. But the other two professionals come from the commissioner's side of the coin. Dr. Marion was a consultative psychologist that saw Ms. Dunn one time and she opined behavioral disturbance would take the form of early quitting due to the buildup of pressure and responsibility. And then finally, and I think most remarkably, the commissioner, of course, has an in-house psychologist review the records, all of the records, and come to some sort of conclusion about what Ms. Dunn can do and what she can't do. That doctor in this case was Sandra Francis, a psychologist, and her opinion is found at page 923 of the record. She found that Ms. Dunn had a marked impairment in the ability to concentrate, persist, and maintain pace. And once again, when that fact was given as the only additional fact to the administrative law judge's hypothetical, the vocational expert testified unequivocally that no work would be available for such a person. What's even more remarkable here is that the administrative law judge assigned different weight to the various health care professional opinions, and the weight that he assigned the most to was Dr. Francis. He gave Dr. Francis' opinion, quote-unquote, significant weight. The Mossio opinion also points to language in an administrative law judge decision, which is identical to the language contained in the Dunn ALJ decision. It's something called the Bjornsson boilerplate, and it comes from a Seventh Circuit case, Bjornsson v. Astrid. The language is, after careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they're inconsistent with the above residual functional capacity. In other words, the Seventh Circuit found, and the Mossio court agreed, that this gets things backwards by implying that the ability to work is determined first and then used to determine the claimant's credibility. That is error, according to Mossio. It can be harmless error, but only if the ALJ properly analyzed credibility elsewhere. In Ms. Dunn's case, the ALJ pointed to only two factors with regard to Ms. Dunn's credibility. The first, I think, is relatively easy to dismiss. He says that Ms. Dunn is incredible because she's failed to comply with treatment. The record on this is just crystal clear. He points, or the government points, to four instances where Ms. Dunn did not take a medication at some point during a visit. She failed to take Welbutrin once, she failed to take Provigil once, she failed to take Armorthyroid once, and she failed to take Abilify once. But this record shows that Ms. Dunn has taken 45 different kinds of medications, and they're all in the record. I provided the court, the ALJ, with all the prescription printouts from the various pharmacies that Ms. Dunn had gone to, and there are 45 different medications. I went back last night and I actually counted how many times she filled those. You know how long she had been on Abilify? It was not long. It was only from one visit to the next. That's it. Were they monitoring her therapeutic levels at all for the cycle? I don't think so because she didn't take the Abilify. Instead, Dr. Swing, when told that she had not taken the Abilify, Dr. Swing re-prescribed a different medication instead. Was there any evidence that it was contraindications for her or was it just a matter of he conceded to her wishes? I believe it's just he conceded to her wishes. All right. But the point is that the government is casting a death sentence in terms of the decision by the ALJ because Ms. Dunn missed four out of 467 different medications that she took. And this doesn't even begin to consider things like missing appointments or not following up on referrals. The ALJ expected perfection. You can't demand perfection here in terms of compliance. If an ALJ can deny a claim because somebody missed a med once, nobody should ever apply for Social Security Disability. It's just that simple. The other reason brought forth by the administrative law judge for discounting Ms. Dunn's credibility was the claimant, and this is a quote, the claimant has not generally received the type of medical treatment one would expect from a totally disabled individual. We have to look at the exact language. Generally. This is not a decision about what goes on generally. This is supposed to be a decision about an individual. So that's an indication the ALJ is not using this as a credibility factor for the individual but a general measure. Counsel, that might be a little overstatement. What's her DSM-3? I'm sorry. What's her DSM-3? What is her? The diagnostic scale in terms of psychiatric problem. What is it? Do you know? Dr. Swing diagnosed her as bipolar, I believe. All right. Okay. So to put that in a clinical sense, what they're saying is based on having a diagnosis of bipolar, it seems like her treatment is inconsistent with that diagnosis, even though they use the word generally. Generally doesn't really mean generally in terms of nonspecific, but in terms of generally with a DSM-3 of bipolar, one's treatment history would be different than what they see in the record clinically. So can you respond to that? I can. Thank you. I see my time is up, Your Honor. Thank you, Your Honor. You have to put that language together with the rest of what the ALJ said. The ALJ not only just said it was a general proposition, but he said it was she had received the type of medical treatment that one would expect. Now, Ms. Dunn went to a psychiatrist once every three months. She had, I believe, 19 visits to Dr. Swing and innumerable visits to Ms. Gosnell. If the ALJ is worried about the type of treatment she's receiving, I don't know how that's inconsistent with her claim of a disabling problem. She got the type of treatment she was supposed to get. If the ALJ meant to say, I'm worried about the degree of the treatment that she got, he didn't say it. For example, if he was worried that she had not been hospitalized. But the rule here is only that the claimant must show that their symptoms can reasonably be accepted as consistent with the evidence. It's not as demanding as I have to check off boxes of some degree of treatment that only the ALJ knows. I don't know it. It's not defined in the regs. And I provided the court with the common definitions of routine and conservative. This is hardly routine and conservative when Dr. Swing is adjusting medications in 16 out of the 19 visits. Thank you. Good morning, Your Honors. May it please the court, I'm Elizabeth Wu. I'm representing the Commissioner of Social Security. The core issue on appeal here is one that's well familiar to the court, and it is not novel. It is simply whether the ALJ's finding that the plaintiff was not disabled is supported by the substantial evidence on the record, and whether the correct legal standards were applied. At the outset, I think it's really important to observe that this is a records review case. And I believe my esteemed counsel is making much of the fact that the four instances out of the record. But effectively, what plaintiff is asking the court to do is to kind of hand-pack this ALJ's decision. The commissioner, by pointing out these four instances on the record, for instance, with respect to the noncompliance, which by the way were not the only instances of noncompliance, clearly as briefed we said, for example, it was by example only. But what the commissioner is asking the court to do is what the ALJ did, and that is to look at those instances against the whole of the record. So the entire record has to be considered together as a whole to reach any type of determination as to whether substantial evidence supported these findings. Having scoured the record, what number have you elevated the four to? Well, Your Honor, just in the ALJ's expressed decision alone, his explicit decision, he cites five more instances. Yes, Your Honor. On the Joint Appendix pages 14, 15, and 16, there are five more instances starting in January 2009. And there's actually a mistake in the ALJ. It must be some type of Scrivener's error. He said December 2009. But if one looks back to the record starting in January 2009, Dr. Swing noted that the plaintiff was not taking her full dosage of Efexor. He clearly says there as well, because she could not afford the full dose, that that is an instance of noncompliance, however. Then in December, about a year later, she was not on her Enbrel for her rheumatoid arthritis. In April and May of 2010, she was discharged from physical therapy because she just did not appear for noncompliance. And then again in 2010 and 2011, she failed to take Enbrel. And these are instances of self-discontinuation. That's still rather de minimis, isn't it? Well, Your Honor, again, the plaintiff argues you can't ask for 100% compliance, zero tolerance. And clearly, that's not what the commissioner is asking the court to do. De minimis, the record shows that Ms. Dunn's instances of noncompliance span almost the entire course of her treatment. She was treated from 2007 through 2010. And starting in 2007, she's already self-discontinuing medication. But you have to put this into context. Not only are the numbers small, but look at what her problem is. Her problem is in the psychiatric area. It's like telling somebody who's manic-depressive, just go cheer up. That's the problem. They just can't just cheer up. And that's part of the problem. It's a struggle to take your medicine. It's a struggle to get out of bed. It's a struggle to do those things. We're not talking about just a broken leg. You didn't take calcium pills every morning to build a bone structure. We're talking about the very thing that makes you want to do what you're supposed to do versus the very thing that hampers you because that's your diagnosis. Wouldn't it be rather draconian for us to take those de minimis numbers, given her DSM-III? You know, that's pretty serious for bipolar in terms of you have therapeutic levels in your blood and all those things, to say that, ah, well, you know, you didn't do it 9, 10, 20 times out of a period of time with over 400. You don't dispute the numbers at your learning council. I do not dispute that she probably filled 446 prescriptions. I don't think that that means that there were 446 separate medications, clearly. So when he said, for instance, that she did not take her medication four separate times, that's a bit of a, I think, a misstatement. But certainly that's very true, Judge Gregory, that this is a difficult diagnosis that she is dealing with. The symptoms are difficult. But the question is whether or not the ALJ's discounted credibility determination with respect to Ms. Dunn is proper in view of the fact that she was not compliant with the treatment modalities that were presented to her. Can I ask you one thing? Other than the four instances that we just heard about, what noncompliance related to her mental health care? You mentioned rehab or not. Those didn't have anything to do with her mental treatment. No, Your Honor. The Enbrel and the physical therapy was clearly for her joint pain. And, Your Honor, you know, the ALJ says in his decision that I am giving less weight to Ms. Dunn's testimony here today. And her testimony was not only that her psychiatric symptoms would prevent her from working, but also that she is clearly suffering from a lot of physical difficulties that come with the other impairments that the ALJ credited, which were the rheumatoid arthritis and fibromyalgia. And she, in her testimony, and this is part and parcel of the ALJ's analysis, is that she is saying, you know, in a good week, or excuse me, in a good month, perhaps I can't get dressed five to seven days. I'm staying in bed. On a good day, I can only stand or sit or walk for X number of hours or for a certain distance. And so she certainly is speaking to not only her mental impairments, but also the physical symptoms that come with the other clearly found impairments. So, yes, Your Honor, in answer to your question, there are those noncompliance that were not even mentioned in the Apley's brief have mostly to do with four of those five have to do with her physical disabilities or impairments, excuse me. And the ones that we did cite, yes, those are the instances where she clearly is not taking medication that has something to do with treating her psychiatric symptoms. And I think it's important also to note that the ALJ did not base his discounted credibility analysis solely on her noncompliance. He, as counsel has pointed out, also spoke to the fact that it seems like the treatment that she received was routine and conservative. And this routine and conservative analysis, I think, rather than giving anybody any heartburn, basically this is the court, it's well settled in Gross v. Heckler that if a symptom can be reasonably controlled by medication or treatment, it's not disabling. So what the ALJ does here is he looks at the kinds of treatment she's received, which was talk therapy with Ms. Gosnell, her counselor, and also the medication for her depression and her anxiety. And what he says is the substantial evidence in the record supports that she responded. She reasonably responded to that treatment. It was routine and conservative. It thankfully did not require more. There is nowhere in the record that talks about other more aggressive or alternative methods of treatment other than tweaking her medication, which we're not discounting, but tweaking it to reach an optimal level indicates that medication is still assisting in controlling her psychiatric symptoms. And what the record shows is that, again, starting in 2007 through 2009, both Dr. Swing and Ms. Gosnell's records show there is an ebb and flow, but there is certainly periods of improvement where Ms. Dunn herself reports, I am feeling a lot better. I have a lot more energy. I can do things outside of the house. I want to look for a job. Then clearly she also comes back at certain times saying, I'm more anxious. I'm feeling depressed. The job search is getting me down, that type of thing. But it is showing, again, looking at the entire record, not just parsing out a bad month, not just parsing out a good month. It's showing that she is reasonably responding to the medication. Where in your scenario would question her credibility in that? Everything you just said for the last two and a half minutes, how does that dismerse her credibility? She went before the ALJ and testified under oath that my psychiatric symptoms, my physical symptoms are so debilitating that I cannot work. I believe what these instances in the record and these clear periods of real improvement and an ability to do things outside of the home, inside of the home, speak to the fact that the persistence, the intensity of the symptoms that she was testifying to at the time before the ALJ are, in fact, belied by the record. Counsel also brings up the Mascio case that was recently decided by this court, and we would just briefly distinguish this case. One issue that was an issue that led to the reversal was the court found that in Mascio, the ALJ determined the plaintiff's credibility before assessing, excuse me, determined the RFC before assessing her credibility. And this is clearly factually distinguishable in this case. Although the ALJ in this case does include the same boilerplate language that was at issue in Mascio, the ALJ here clearly and specifically engaged in a credibility analysis apart from that. And the Mascio court said if there is error, it's harmless error if the ALJ were to have done that, which is what the ALJ did in this case. Here, again, to the credibility issue, the ALJ said, I am finding Ms. Dunn less credible because the routine and conservative nature of the treatment that seems to be working for her is at odds with what she is saying, how badly disabled she is or how completely disabled she is here today, and also her lack of compliance, which there is clearly Social Security ruling 96-7P allows the ALJ to look at the longitudinal medical records but to consider the individual statements in view of that. That if the medical reports or the records show that the plaintiff isn't following the treatment, depending on the reason given, and there were very few reasons given here for her noncompliance, but depending on the reasons given, that can impact on credibility. And finally, my remaining moments, I would like to address very briefly the characterization that the four medical opinions were, in fact, all the same. That is not the case. Clearly, Dr. Swing, Ms. Gosnell, found that Ms. Dunn has marked impairments, marked difficulties that would render her unable to work, essentially. Even counsel, in brief, in footnote five, notes that Dr. Marion, the state agency psychologist, didn't quite come out and say she can't work, but said rather that her impairments, her psychiatric impairments would lead to her having difficulty with doing a full day, working a full day without quitting early and that type of thing. But Dr. Marion clearly found in her RFC that Ms. Dunn was only mildly to moderately impaired in her ability to deal with employment stressors and that she was capable of performing simple, repetitive tasks consistently well, and that's page 911 of the record. And most significantly, Dr. Francis, who was the non-examining state agency psychologist, did in fact, counsel's correct, she did check that plaintiff had marked difficulties in concentration, persistence, and pace. But what's most significant is when one reads the entire analysis by Dr. Francis, and this is specifically on page 926 of the record, her summary conclusions, Dr. Francis had to evaluate across 20 different areas, mental activities that would have bearing on Ms. Dunn's ability to function in the workplace. And in none of those 20 areas did she find that there was anything more than a mild or moderate impairment. So the commissioner can't speculate that when she checked marked before that that was an error, but nowhere else in her RFC, in her analysis, does she find that there was any kind of marked impairment on the part of Ms. Dunn in the areas of concentration, persistence, and pace, which was the area where the checkbox had marked versus something less. And most significantly, she found that the plaintiff was capable of performing routine, simple tasks in a non-stressful environment with limited co-worker contact. That is not a finding of disability. That is not a situation where all four of these medical opinions are in agreement. And the ALJ properly based his finding on the substantial evidence on the record in assigning the greater weight to Dr. Francis. I see that my time is up, so if the court doesn't have any questions. Thank you very much. Let me start with what I heard Ms. Wu say here with respect to the other incidents of noncompliance. Your Honor, Judge Lewis appropriately points out that the vast majority of them, the four out of the five, respected her physical problems, which we've never contested. But the thing that I also heard was the one thing, the time that she didn't take the effects, or she couldn't afford it. And the rules and the regulations, the rulings, are very clear that to the degree you're going to look at noncompliance at all. You have to look at whether there's a reason why there was noncompliance, and that was certainly a justifiable cause. I want to move on to Dr. Francis. The Commissioner says that pages 926 and 927 of the record belie Dr. Francis's conclusion that Ms. Dunn has a marked impairment in concentration, persistence, and pace. It is true. There are 20 different basic mental work activities here on those two pages, and none of them are checked as marked. But 13 of them are moderately limited, 13 out of the 20. And that's every reason to believe why, in summary, she arrived at the conclusion that the aggregation of all of these things would have resulted in a marked impairment. There's no indication in the record that Dr. Francis wanted to check any other box than the box that it was marked. And that's certainly consistent with what Dr. Swing said, as Gosnell said, and, I believe, Dr. Marion. And finally, there was a reference to Social Security ruling 96-7P. I've been doing this 36 years, and I don't think I've ever had a client who couldn't work. It has always been a question of consistency, always. The fact that they're in my office says they can work. They can go to the front. They can answer the phones. It is always a question of consistency. So 96-7P rightfully points out, as I believe Judge Gregory pointed out, that you need to look at the longitudinal medical record here, and that, quote-unquote, persistent attempts by the individual to obtain relief of symptoms such as increasing meds, trials of various modalities, and an attempt to find one that works or does not have side effects may be a strong indication that the symptoms are a source of distress. The bottom line is that she went to the psychiatrist. She went to the counselor. And there is no indication that that is any way inconsistent with her claims about her problems, any. I think it was something different. I think the judge was expecting her to be hospitalized. And that's just simply not the case. I want to thank the Court for its time. Thank you very much. We will come down and greet the lawyers, and then we'll take a brief recess.
judges: Diana Gribbon Motz, Roger L. Gregory, Mary G. Lewis